**Walton W. MIMS, Individually and as representative of a class of citizens composed of resident and taxpayers of a common geographical subdivision, Plaintiffs,**

**v.**

**W. G. YARBOROUGH et al., Defendants.**

**Civ. A. No. 71–882.**

United States District Court, D. South Carolina, Greenwood Division.

Dec. 6, 1971.

---

Stanley H. Kohn and Gerald M. Finkel, of Kohn & Finkel, Columbia, S. C., for plaintiffs.

Howard L. Burns and J. Kendall Few, of Burns, McDonald, Bradford, Erwin & Few, Greenwood, S. C., for defendants as members of the Edgefield County Water and Sewer Authority.

HEMPHILL, District Judge.

On August 26, 1971, the plaintiff instituted this suit, by filing his complaint in this alleged class action on behalf of the residents and taxpayers of Edgefield County, South Carolina, against the Edgefield County Water and Sewer Authority and others. The United States Army Corps of Engineers, United States Department of Housing and Urban Development and United States Department of Commerce have all been dismissed [1] as party defendants by consent. Plaintiff seeks an Order restraining the Water Authority from continuing with further implementation of a water distribution

---

1. Approved by pretrial order dated November 2, 1971.

project which the plaintiff contends is in contravention of various Federal Acts. The Water Authority, by its Answer asserts three basic defenses: (1) a general denial, (2) laches and (3) an affirmative defense alleging that the Federal financing of the Water Authority's Proposed Water Distribution Project is a co-operative venture of the Farmers Home Administration (FHA), the Economic Development Administration of the Department of Commerce (EDA) and the Department of Housing and Urban Development (HUD), and alleging further that the Plan for the Water Authority's Proposed Water Distribution Project complies with the Federal Legislation applicable to each of these agencies.

Initially the plaintiff contended that the Water Authority had failed to provide proper notice of its proposal and had failed to allow the residents and taxpayers of Edgefield County an opportunity to express their views on the matter. After hearing testimony on plaintiff's application for a preliminary injunction (which was denied by this court on September 1, 1971), a pretrial conference was held at Greenwood, S. C., on November 1, 1971, at which time the plaintiff and defendant agreed and stipulated that public notice was no longer an issue. A Pretrial Order was issued setting forth the two remaining issues for determination by this court:

1. Do the Plans for a County-wide Water and Sewer System for Edgefield County, as it is presently proposed, contemplate the receipt and use of available funds (from grant or loan) for purposes violative of the Federal Statutes authorizing and controlling the establishment of such a system?

2. Is plaintiff guilty of laches and unreasonable delay in the bringing of this action after full knowledge on his part of the nature and extent of the Water facilities proposed to be constructed? [2]

The Edgefield County Water and Sewer Authority was created by the General Assembly of the State of South Carolina pursuant to Act No. 571 of 1967. This Act was later amended by Act No. 1192 of 1970. As amended, insofar as it pertains to this action, the Act provides as follows:

Section 1. There is hereby created a body corporate and politic to be known as the Edgefield County Water and Sewer Authority . . . . Its service area shall include all of Edgefield County and a small area of Aiken County described in Section 6 . . . . It shall be the principal function of the Authority to acquire supplies of fresh water, capable of being used for industrial and domestic purposes, and to distribute such water, in the manner herein provided, for industrial and domestic use within its service area. To that end, it shall be empowered to construct such . . . water distribution facilities, water mains and water lines, as in the opinion of the Authority may be deemed necessary . . . .

\* \* \* \* \* \*

Section 6. To the end that the Authority shall not unduly compete with the existing publicly operated water systems in the county, the Authority shall not . . sell water elsewhere than in Edgefield County and in a small area in the southwestern corner of Aiken County bounded on the east by the eastern right of way of U. S. Highway No. 25 and the south by the southern right of way of U. S. Interstate 20. Edgefield County and the above described area of Aiken County are hereby defined to be the service area of the Authority.

Section 7. The Authority shall be fully empowered to acquire, construct, operate, maintain, improve and extend facilities which would enable it to obtain fresh water in large volume, and to distribute and sell the same . . . at any point within its service area. To that end the

---

2. The Pretrial Order also included an agreement of counsel at the pretrial hearing that the entire record before the court at the hearing on the Motion for preliminary injunction, September 1, 1971, be included as a part of the record.

Authority shall have the following powers:

\* \* \* \* \* \*

(9) To build, construct, maintain and operate water distribution systems for the distribution of water for domestic or industrial use and from time to time to enlarge and extend such systems.

\* \* \* \* \* \*

(11) To acquire gifts or grants of services, properties or moneys from the United States, or any of its agencies, under such conditions as the United States, or such agency shall prescribe.

\* \* \* \* \* \*

(25) To borrow money and to make and issue negotiable bonds, notes and other evidences of indebtedness, payable from all or any part of the revenues derived from the operation of its facilities . . . .

## CHRONOLOGY

July 12, 1967—Creation of the Edgefield County Water and Sewer Authority by legislative enactment.

December, 1967—Engineering firm of Davis and Floyd, Engineers, Inc., Drawer 428, Greenwood, S. C., employed by the Edgefield County Planning Board to develop a comprehensive plan for water and sewer development for Edgefield County.

May 13, 1968—Engineering firm met with county officials and the Edgefield County Planning Board.

July 9, 1968—Engineering firm met with the Edgefield County Planning Board.

October 30, 1968—Another meeting with the County Planning Board.

November 6, 1968—The Edgefield County Water and Sewer Authority applied to the United States Department of Housing and Urban Development (HUD) for an advance of funds for Public Works Planning.

January 17, 1969—Complete report (Defendant's Exhibit B) was approved, and the engineers were authorized to proceed. This was a formal approval of the comprehensive plan by the Edgefield County Planning Board.

October 1969—Contract for final plans with the engineer was signed (HUD Form 4430).

November 19, 1969—HUD Form 4430 submitted requesting review and approval of the planning. At this time the target date for start of construction was amended to September 1970.

February 10, 1970—Authorization for the project was granted by the State Planning and Grants Division and by the Upper Savannah Planning District. The State Water Resources Commission approved also, but deferred comment until the point of withdrawal is established.

March 2, 1970—Application was made to the Department of Commerce for a grant to cover the project.

March 27, 1970—Assurance of compliance with the Civil Rights Act of 1964 signed by the Edgefield County Water and Sewer Authority.

April 17, 1970—Open meeting held in Edgefield to answer questions about the system as proposed and adopted.

April 28, 1970—Jaycee Meeting.

April 28, 1970—Meeting at Johnston High School.

May 5, 1970—American Legion Meeting.

May 7, 1970—Johnston Lions Club Meeting.

May 7, 1970—Edgefield Masonic Lodge Meeting.

May 11, 1970—Edgefield Lions Club Meeting.

May 12, 1970—Meeting at Edgefield Courthouse.

July 28, 1970—Conference of agency officials at Edgefield.

August 26, 1971—Complaint filed in United States District Court for the District of South Carolina.

August 26, 1971—United States District Judge signed temporary restrain-

ing order and issued Rule to Show Cause to defendants, to be heard September 1, 1971.

August 31, 1971—Defendant Army Corps of Engineers moves to vacate temporary restraining order.

September 1, 1971—Answer of defendants, members of the Edgefield County Water and Sewer Authority filed.

September 1, 1971—Motion for preliminary inspection heard, Rule to Show Cause discharged and temporary restraining order vacated. United States Army Corps of Engineers dismissed as a party.

October 26, 1971—United States Department of Housing and Urban Development and United States Department of Commerce answer, at the same time contesting the jurisdiction of the court.

October 27, 1971—Public Meeting held at Edgefield County Courthouse by United States Army Corps of Engineers.

November 1, 1971—Pretrial hearing at Greenwood, S. C. Issues set forth. Agreed that no South Carolina statutes were questioned and that all matters and evidence submitted to the court at the hearing on the Rule to Show Cause be included in the record for consideration on the merits. At this pretrial plaintiff's counsel stipulated that there no longer existed an issue as to whether the Authority had met publication requirements. Other matters were discussed. Hearing set for November 11.

November 11, 1971—Hearing on merits at Greenwood, S. C. Proposed orders ordered submitted.

## QUESTIONS PRESENTED

1. Do the plans for a county-wide water and sewer system for Edgefield County, as it is presently proposed, contemplate the receipt and use of available funds (from grant or loan) for purposes violative of the Federal Statutes authorizing and controlling the establishment of such a system?

2. Is plaintiff guilty of laches and unreasonable delay in the bringing of this action after full knowledge on his part of the nature and extent of the water facilities proposed to be constructed?

## BACKGROUND GEOGRAPHY

The controversy here involves the layout of the water distribution system as set forth in the report, entitled, "Engineering Report and General Data—Proposed Water Facilities"[3] filed by the engineering firm.[3] To understand the controversy, however, it is necessary first to understand the geography of Edgefield County. Edgefield County is basically a five-sided county bounded on the North by Greenwood County, on the Northeast by Saluda County, on the Southeast by Aiken County, on the Southwest by the Savannah River and on the West by McCormick County. There are six census divisions in Edgefield County:

1. Pleasant Lane lies in the extreme northern portion of the county.

2. Edgefield North lies in the north central portion of the county.

3. Edgefield South lies in the west central portion of the county.

4. Johnston lies in the extreme eastern corner of the county.

5. Trenton lies in the southeastern section of the county.

6. Meriwether lies in the extreme southern end of the county.

There are three small towns located in Edgefield County. Edgefield is located near the center of the county on the boundary line between two census divisions: Edgefield North and Edgefield South. Johnston lies in the northeastern section of the county in the Johnston census division. Trenton lies in the southeastern portion of the county in the Trenton census division.

In 1960, Edgefield County had a population of 15,735; and in 1970 this fig-

3. Defendant's Exhibit F.

ure dwindled to 15,476. The population of this county has decreased consistently for over 50 years. In 1960 Pleasant Lane had a population of 1330, which had decreased to 1297 in 1970.[4] Edgefield North had 1672 in 1960, 1297 in 1970, Edgefield South had 1676 rural and 2876 urban in 1960, 1249 rural and 2479 urban (in the City of Edgefield) in 1970; Johnston had 5252 in 1960, 4781 in 1970 and Trenton had 1733 in 1960 and 1425 in 1970. The only division increasing in population was Meredith, from 1196 in 1960 to 2696 in 1970; this is partially explained by relocation of the southern boundary of Edgefield County in such a way as to take in part of Aiken County and that portion added included both sides of a fairly populous highway.

## THE PLAN

The Engineering Report and General Data projected the following recommendations:

1. That the Authority purchase the Water Distribution Systems of the three towns.

2. That the Authority construct a Water Distribution System consisting of an intake structure and filter plant on the Savannah River in the southern end of Edgefield County in the Meriwether census division. From this point a water main would run in an easterly direction to a point on U. S. Highway No. 25. From there the main would turn in a northerly direction and run along U. S. Highway No. 25 through the middle of the Trenton census division to a point near the Town of Trenton. From this point the water main would fork out in two directions, one running through Trenton in a northeasterly direction to Johnston and the other running in a northwesterly direction along Highway 25 to Edgefield.

3. That the Proposed Water Distribution System be financed in part through anticipated revenues and in part by grants from HUD and EDA.

Acting on the recommendations contained in the Engineering Report and General Data, in early spring of 1970 the Water Authority made applications to FHA, EDA and HUD for grants and loans for the purpose of constructing the Proposed Water Distribution System and retiring the obligations of the Water Systems of the three towns. Between April 17 and May 12 of 1970 three Public Meetings and several civic club meetings were held in the Towns of Johnston and Edgefield at which time the Engineers and other representatives of the Authority explained the Proposed System. On May 14, 1970, separate elections were held in each of the three towns resulting in a combined vote of approximately ten (10) to one (1) in favor of transferring the Water Systems and obligations of the three towns to the Water Authority. Shortly after these elections, the Water Authority was notified by the three federal agencies that grants and loans in the aggregate amount of Five Million Seventy-Four Thousand and No/100 ($5,074,000.00) Dollars had been approved to finance the project. The grants and loans so approved were broken down as follows:

1. An EDA grant of One Million Six Hundred Ninety Thousand and No/100 ($1,690,000.00) Dollars.

2. An FHA loan of One Million Six Hundred Ninety-Four Thousand and No/100 ($1,694,000.00) Dollars.

3. An HUD loan in the amount of One Million and No/100 ($1,000,000.00) Dollars.

4. An HUD grant in the amount of Six Hundred Ninety Thousand and No/100 ($690,000.00) Dollars.

The federal statutory authority for these grants and loans is as follows:

1. EDA grant. 42 U.S.C. § 3131.

2. FHA loan. 7 U.S.C. § 1926.

3. HUD loan. 42 U.S.C. § 1492.

---

4. Census figures.

4. HUD grant. 42 U.S.C. § 3102.

The statutes, evidence and application will be discussed separately.

−A−

## THE PUBLIC WORKS AND ECONOMIC DEVELOPMENT ACT OF 1965 (PUBLIC LAW 89–136, AUGUST 26, 1965, 79 STAT. 552) 42 U.S.C. § 3121 ET SEQ.

The grant under this Act (hereinafter designated EDA) is bound to the purpose stated in 42 U.S.C. § 3121.

The Congress declares that the maintenance of the national economy at a high level is vital to the best interests of the United States, but that some of our regions, counties, and communities are suffering substantial and persistent unemployment and underemployment; that such unemployment and underemployment cause hardship to many individuals and their families, and waste invaluable human resources; that to overcome this problem the Federal Government, in cooperation with the States, should help areas and regions of substantial and persistent unemployment and underemployment to take effective steps in planning and financing their public works and economic development; that Federal financial assistance, including grants for public works and development facilities to communities, industries, enterprises, and individuals in areas needing development should enable such areas to help themselves achieve lasting improvement and enhance the domestic prosperity by the establishment of stable and diversified local economies and improved local conditions, provided that such assistance is preceded by and consistent with sound, long-range economic planning; and that under the provisions of this Act new employment opportunities should be created by developing and expanding new and existing public works and other facilities and resources rather than by merely transferring jobs from one area of the United States to another.

Section 3131 of 42 U.S.C. provides, in part, as follows:

(a) Upon the application of any State, or political subdivision thereof, Indian tribe, or private or public non-profit organization or association representing any redevelopment area *or part thereof*, the Secretary of Commerce . . . is authorized—

(1) to make direct grants for the acquisition or development of land and improvements for public works, public service or development facility usage, and the acquisition, construction, rehabilitation, alteration, expansion, or improvement of such facilities, including related machinery and equipment, within a redevelopment area, if he finds that—

\*   \*   \*   \*   \*   \*

(B) the project for which a grant is requested will fulfill a pressing need of the area, *or part thereof*, in which it is, or will be, located;

\*   \*   \*

(f) The Secretary shall prescribe regulations which will assure that appropriate local governmental authorities have been given a reasonable opportunity to review and comment upon proposed projects under this section. [Emphasis added.]

Plaintiff, in brief and oral argument before the court, contends that the Plans for a county-wide system for Edgefield County, as it is presently proposed by the Water Authority contemplates the receipt and use of grant funds from EDA for purposes violative of the Public Works and Economic Development Act of 1965 in the following particulars:

(a). That the Water System as it is presently proposed contemplates expenditure of funds for some facilities to be located in Aiken County in an area not eligible for assistance under the Act.

(b). That the main thrust of the Act is to aid chronically depressed areas in acquiring developmental facilities needed to support their self help efforts to develop more jobs. That the rural

heart of Edgefield County is such an area but is ignored in the Plans for a County-wide System as it is presently proposed in that the Water Authority failed to consider potential alternate routes through this chronically depressed area.

(c). That, in developing its Plan for a County-wide Water System as presently proposed the Water Authority emphasized economic feasibility rather than need. That such resulted in the Authority distinguishing between alternate routes and areas based upon their relative economic feasibility or ability to pay and that such was improper under the Act.

(d). That in developing the Plans for a County-wide Water System as presently proposed the Water Authority improperly misplaced the emphasis on acquisition of industry rather than aiding disadvantaged peoples in chronically depressed economic areas as required by the Act.

(e). That the Plans for a County-wide Water System for Edgefield County as it is presently proposed contemplates the location of the intake structure and treatment facility in the Meriwether census division of Edgefield County. That such a location is improper under the Act because this area is rapidly gaining in population. That the Meriwether census division is an urbanizing area and the purposes of the Public Works and Economic Development Act of 1965 is wholly inconsistent with urban development.

(f). That the inclusion of a small portion of Aiken County in the service area of the Water Authority is violative of the purposes of the Act.

(g). That the Plans for a County-wide Water System for Edgefield County, as it is presently proposed by the Water Authority, contemplates the extension of financial assistance to a public service facility which would compete with an existing public utility in violation of 42 U.S.C. § 3131(e).

Each of these contentions is correspondingly catalogued and discussed separately hereinafter:

(a). *Ineligibility of Aiken County for Assistance Under EDA Act.*

Reference to Exhibit P, entitled "General Layout of System" contained in Defendant's Exhibit F, and other testimony of the Engineers, employed by the Water Authority show that the System, as it is presently proposed, contemplates that three small water lines varying in size from six inches to ten inches will be located in that portion of Aiken County contained within the "Service Area" as defined by the Act creating the Water Authority. No testimony was submitted by the plaintiff on the question of whether this portion of Aiken County is eligible for assistance under the EDA Act. There is evidence on behalf of the defendant that representatives of EDA at various levels have reviewed the Plan of the Authority showing the inclusion of this portion of Aiken County and have approved the project. In addition, two Affidavits submitted by Dan B. Mackey, Executive Director of the Upper Savannah Development District, are of particular significance on this point:[5]

PERSONALLY appeared before me Dan B. Mackey, who being duly sworn, states:

1. That he is and has been during the times herein referred to, the Executive Director, Upper Savannah Planning & Development District which District includes Edgefield County, South Carolina.

\* \* \* \* \* \*

5. That his work has involved him, his office and Board in most EDA grants in the counties of his District and he has personally been familiar with the planning, development, considerations and degree of publicity attendant to each, and in this regard, this

5. Included as a part of the record under the agreement of counsel at Pretrial of November 1, 1971.

project of the Edgefield Authority is outstanding. From his careful study, the proposed project is critically needed, well planned, ideally located and will provide an outstanding improvement for the underprivileged, unemployed and marginal economic groups of Edgefield County, and is essential to improving the economic conditions there.

\*   \*   \*   \*   \*   \*

"The undersigned, Dan B. Mackey, III, being duly sworn, states that he is the Executive Director of the Upper Savannah Development District, and that, as such, he is familiar with the Affairs of the Economic Development Administration of the Department of Commerce. The Economic Development Administration of the Department of Commerce has designated all of Edgefield County as a re-development area. That portion of Aiken County that is included within the service area of the Edgefield County Water and Sewer Authority has been designated by the Economic Development Administration as a part of the growth center area, making it eligible for all assistance available under the Economic Development Administration Program."

■ This Court finds as a fact that a small portion of the funds contemplated for use under the project will be used to construct water lines in a small area of Aiken County which is included in the "service" area of the Authority. Furthermore, this small area is eligible for assistance under the Public Works and Economic Development Act of 1965. There is no evidence that the Authority included this area for any reason than to support the feasibility of the entire project. The inclusion of a part of Aiken County in the project, under the circumstances was complementary to and in aid of the general purpose, in accordance with the intent of the Act, to give much needed economic development to Edgefield County.

– B –

## CONSIDERATION OF ALTERNATIVE ROUTES

The plaintiff's position on this point is that the Water Authority failed to give proper consideration to an alternate route which he advocates.[6] During the testimony the route proposed by the Water Authority was referred to for convenience as the "Highway 25 Route". The route advocated by the plaintiff was referred to for convenience as the "Highway 23 Route". As described above, the Water Authority's Highway 25 Route would run from a point on the Savannah River through the Meriwether and Trenton census divisions in the southern end of Edgefield County along Highway

---

6. Plaintiff's reply to A's proposed finding and conclusions argues, in part:

At the outset we must all recognize that it is not controverted that two of the six census division areas of Edgefield County (Edgefield North and Edgefield South) are programmed for water in ten to twenty years, and only, according to the testimony of Emmett Davis "as the area develops and when and if they can financially support a system." One complete census division area of the County (Pleasant Lane) is not even programmed for water at any future time. These three areas, in excess of half of the geographical area of the County, are what have been categorized as the "rural heart" of Edgefield County by the plaintiff.

Likewise, there is no controversy that area of the County has lost population consistently for the past fifty (50) consecutive years.

While Mr. Davis has predicted a population growth in these areas in 1968, 1969, 1970 and on into the future at about six (6%) percent per year, it did not materialize in 1968, 1969 and 1970 and there is no earthly basis on which anyone could rely which would cause such a reversal of trend without water. The court obviously recognizes this. There is no reason why anyone would want to move into that area of the County. Yet, this county-wide water system is based on that conjecture: that the population would increase and would eventually support a water system.

25 to the three towns. The Highway 23 Route proposed by the plaintiff would begin several miles to the north at a point on the Savannah River in the Clark's Hill Reservoir in McCormick County. It would then run in an easterly direction near the Town of Modoc into the Edgefield South census division and from there along Highway 23 to Edgefield and then on to Johnston and Trenton. The plaintiff presented ample evidence that this route runs through a chronically depressed area which has experienced considerable out-migration and an acute shortage of water supply. There is little doubt that property owners along Highway 23 would benefit from the location of the water line along this route.

One of defendant's witnesses was South Carolina State Director of FHA (Ed Pittman) who testified that the three agencies had worked together in reviewing the project and that FHA had been designated as the lead agency by EDA and HUD and that he had been designated the principal coordinator. He testified that he had attended various meetings with representatives of EDA and HUD at which time the Highway 23 Route advocated by the plaintiff was discussed. He testified that additional information was requested from the Engineer on this point and that such information was furnished by the Engineer. He further testified that subsequent to that time the project was approved by the three agencies. He further testified that in applying the criteria established by the FHA to the project that FHA and HUD had established a joint amortization schedule for their loans which were involved in the project and that, based on this schedule and the criteria established by the FHA they had determined that the Authority would have to have an additional One Thousand (1,000) water customers to meet the financial feasibility requirements established by FHA. He further testified that the Engineers furnished information that the Authority had commitments from over One Thousand (1,000) potential customers along the Highway 25

Route but that there were only One Hundred (100) potential customers along the Highway 23 route. He further testified that a representative of his office verified the fact that only One Hundred (100) potential customers were located along the Highway 23 route. He further testified that a System located along the Highway 23 route would not meet the economic feasibility requirements of FHA and that FHA could not participate in such a project.

The Chief Engineer for FHA (Cecil Rose) testified that additional information had been requested from the Engineer relative to the Highway 23 route proposed by the plaintiff, that such information was furnished by the Engineer and that subsequent to the furnishing of such information the project was approved by the three agencies. He testified that he had met on several occasions with the Chief Engineers of EDA and HUD at which time the project was reviewed in light of the criteria established by the three agencies and subsequently that the project was approved by each of the three agencies.

Emmett Davis, President of the Engineering firm employed by the Water Authority testified that his firm had considered the Highway 23 route advocated by the plaintiff together with another alternate route in the same general area before making a final decision to recommend the Highway 25 route to the Water Authority. He testified that the Highway 25 route would serve Seventy-Five (75%) per cent of the population of Edgefield County in Phase I of the Comprehensive Plan developed by his firm, and that a water line along the Highway 23 route proposed by the plaintiff from Edgefield toward Modoc was scheduled for Phase II of the Comprehensive Plan during the next ten (10) to twenty (20) years as funds become available. He further testified that the Highway 23 route had recently been reviewed by his firm, and a profile and cost analysis developed which indicated that a system developed along this route would cost approximately One Million

and No/100 ($1,000,000.00) Dollars more than a system developed along the Highway 25 route.

Mr. Davis further testified that he had worked on several EDA projects and, as such, had become familiar with the thrust and emphasis of the EDA in applying the Public Works and Economic Development Act of 1965. He testified that their main considerations in providing assistance for water facilities were to provide industrial opportunities in chronically depressed areas and to provide essential public services to disadvantaged persons. He testified that his firm had reviewed the project in light of these considerations and had determined that the Highway 25 route would provide an essential public service to large concentrations of disadvantaged persons along Highway 25 and would provide opportunities for industrial development along the route which would provide employment opportunities accessible to residents of all areas of Edgefield County.

■ It therefore appears from the credible evidence and the court finds as a fact that the area described by the plaintiff as the "rural heart of Edgefield County" is not ignored in the proposed Water Distribution Plan and that the Highway 23 route proposed by the plaintiff was given proper consideration by the Authority.

The court also finds that the water system, as it is presently proposed by the Water Authority, fulfills the purposes of the Public Works and Economic Development Act of 1965, as set forth in 42 U.S.C. § 3121 and the criteria established by EDA in the administration of that Act.

## – C –

## CONSIDERATION OF ECONOMIC FEASIBILITY

This project is a cooperative venture of three federal agencies, EDA's contribution by grant under the Public Works and Economic Development Act of 1965 is roughly one-third of the funds necessary to fund the project. Another one-third of the funds comes from a loan from FHA. Representatives of FHA testified rather unequivocally that, under economic feasibility criteria established by their agency they required the Authority to obtain a thousand additional customers outside of the three towns. They testified further that the project had reached the maximum grant-loan relationship allowable. In other words, lack of economic feasibility could not be remedied merely by substituting grant funds for loan funds as the maximum amount of grant funds had already been utilized. Nothing in the Public Works and Economic Development Act of 1965 is found that would prohibit such a cooperative venture by the EDA, nor do I find any requirement under this Act that a public utility receiving EDA funds choose the least economically feasible alternative available to it.

■ From the credible evidence the court finds as a fact that the economic feasibility considerations employed by the water authority were required by FHA and that a consideration of such factors does not make the project ineligible for participation by EDA.

## – D –

## EMPHASIS ON ACQUISITION OF INDUSTRY RATHER THAN AIDING DISADVANTAGED PEOPLES.

■■ Based on the credible evidence the court finds as a fact that promoting industrial opportunities in a chronically depressed economic area, as well as aiding disadvantaged peoples in obtaining basic public services, are both legitimate considerations under the Public Works and Economic Development Act of 1965. The court also finds that large concentrations of disadvantaged persons are located along the Highway 25 route proposed by the water authority and that the water system, as it is presently proposed, will provide basic public services to many of these disadvantaged persons. Further, that opportunities for industrial development will be created along the

Highway 25 route proposed by the water authority, and that these opportunities will be accessible to persons living in all areas of Edgefield County and will tend to diminish out-migration from these areas.

– E –

EFFECT OF LOCATION OF INTAKE STRUCTURE AND TREATMENT FACILITY IN MERIWETHER CENSUS DIVISION.

Figures contained in Appendix A attached to the plaintiff's brief indicate that, of the six census divisions in Edgefield County, all lost population between the 1960 and 1970 Census with the exception of Meriwether, which gained in population from 1,196 to 2,696. A possible explanation for some, if not all, of this population increase is the fact that during the 1960's the Edgefield-Aiken County line was changed to include additional areas in Edgefield County. Assuming, however, that the area is gaining in population, what effect would this fact have upon the eligibility of this project for EDA assistance?

It is clear that the Economic Development Act of 1965 has as one of its basic purposes providing assistance to chronically depressed areas "suffering substantial and persistent unemployment and under-employment". 42 U.S.C. § 3121. Under 42 U.S.C. § 3131, quoted in part above, the Secretary of Commerce is authorized to make grants to any "private or public nonprofit organization or association representing any development area or part thereof" for "the acquisition or development of land and improvements for public works" if he finds that the project will tend to improve opportunities in the area or establishment of expansion of industrial facilities or "otherwise assist in the creation of additional long-term employment opportunities for such area." Under this section the Secretary of Commerce is given considerable discretion. He need find only that the grant applicant represents a part of a redevelopment area and that

the effect of the project for which the application is made will assist in the creation of long-term employment opportunities within the area. The fact that a part of the public works project is located in a part of the redevelopment area that is less economically depressed than the remainder of the redevelopment area is of no consequence, nor is it of any consequence that this portion of the redevelopment area may be urbanizing while the remainder is losing in population.

– F –

THE EFFECT OF THE INCLUSION OF A SMALL PORTION OF AIKEN COUNTY IN THE SERVICE AREA OF THE WATER AUTHORITY.

Here, again, there is no merit to the point raised by the plaintiff. 42 U.S.C. § 3131 requires only that the grant applicant represent "any redevelopment area or part thereof." The water authority represents all of one redevelopment area, Edgefield County, and the fact that it also represents a portion of another county is of no consequence.

– G –

COMPETITION WITH OTHER EXISTING PUBLIC UTILITIES.

42 U.S.C. § 3131(e) provides that financial assistance shall not be extended with respect to a public service facility "which would compete with an existing privately owned public utility". Plaintiff appears to rely on the fact that that portion of the service area of the water authority lying in Aiken County is somewhat near the City of North Augusta. Assuming this to be the case and assuming further that North Augusta is serviced by a privately owned public utility, there is no evidence in the record that such a public privately owned public utility has served or has offered to serve or is capable of serving any other area included within the water authority's service area. On the contrary, the General Assembly of the State of South Carolina specifically designated the service area

of the water authority "to the end that the Authority shall not unduly compete with the existing publicly operated water systems in the county." Act No. 571 of 1967, Section 6, as amended by Act 1192 of 1970.

The court, on the basis of the above, finds that the water system, as it is presently proposed by the water authority, will not compete with any existing privately owned public utility.

## THE FHA LOAN

The FHA Loan is authorized under 7 U.S.C. Section 1926 [7], which provides, as follows:

> The Secretary also is authorized to make or insure loans to associations, including corporations not operated for profit and public and quasi-public agencies, to provide for . . . the conservation, development, use and control of water . . ., all primarily for serving farmers, ranchers, farm tenants, farm laborers, and rural residents, and to furnish financial assistance or other aid in planning projects for such purposes . . .

Both the Chief Engineer for FHA and the State Director for FHA for South Carolina testified that they had carefully reviewed the project and applied the criteria established by FHA in the administration of this Act. They testified that under the criteria established by FHA, loans could be made to finance water facilities in rural areas and in small municipalities having a population of less than 5,500. They both testified that the Towns of Edgefield, Trenton and Johnston each had populations of less than 5,500, and that the remainder of the area serviced by the authority was a rural area eligible for FHA financing. Noteworthy is the fact that the statute particularly emphasizes "the service provided or made available . . . shall not be curtailed or limited by inclusion of the area served . . .

within the boundaries of any municipal corporation or other public body."

The court finds as a fact that the plans for a county-wide water system for Edgefield County, as is presently proposed by the water authority, contemplate the receipt and use of a $1,694,-000.00 FHA loan for purposes consistent with 7 U.S.C. § 1926 and the criteria established in the administration of this statute by FHA.

## HUD LOAN

The HUD loan of $1,000,000.00 is authorized by 42 U.S.C. § 1492 which provides as follows:

> (a) The Secretary of Housing and Urban Development is authorized (1) to purchase the securities and obligations of, or make loans to, municipalities and other political subdivisions and instrumentalities of one or more States (including public agencies and instrumentalities of one or more municipalities or other political subdivisions of one or more States), and Indian tribes to finance specific projects for public works or facilities under State, municipal or other applicable law . . . .
>
> \* \* \* \* \* \*
>
> (c) In the processing of applications for financial assistance under clause (1) of subsection (a) of this section the Secretary shall give priority to applications of smaller municipalities for assistance in the construction of basic public works (including works for the storage, treatment, purification, or distribution of water; sewage, sewage treatment, and sewer facilities; and gas distribution systems) for which there is an urgent and vital public need. As used in this section, a 'smaller municipality' means an incorporated or unincorporated town, or other political subdivision of a State, which had a population of less than ten thousand inhabitants at the time of

7. Entitled: "Water facilities loans to associations; limitation; prohibition against curtailment to services;

the last Federal census, or an Indian tribe. Notwithstanding any other provision of this chapter, the Secretary may extend financial assistance, as otherwise authorized by clause (1) of subsection (a) of this section, to any private nonprofit corporation to finance the construction of works for the storage, treatment, purification, or distribution of water or the construction of sewage, sewage treatment, and sewer facilities, if such works or facilities are needed to serve a smaller municipality or rural area, and there is no existing public body able to construct and operate such works or facilities.

Under this statutory authority the the Secretary of HUD is authorized to make loans to political subdivisions and instrumentalities to finance specific projects for public works. The Secretary is directed to give priority to applications of small municipalities (less than 10,000 inhabitants) for assistance in the construction of basic public works for which there is an urgent and vital public need.

Mr. Emmett Davis, President of the Engineering firm employed by the water authority, testified at length as to the urgent need of the three towns to provide water treatment and distribution facilities both for industrial and residential purposes. The existing situation in the three towns is described in defendant's Exhibit F, Page 5, as follows:

> Changes in the economic structure in Edgefield over the past 20 years has resulted in a migration of the farm population to the urban and suburban areas, placing a burden on the limited public service facilities presently provided by the small municipalities. This migration, although posing a serious threat of exhausting existing sources of raw water and overloading sewerage treatment facilities, is provising available manpower favorable to further industrialization. However, adequate supplies of water and other public services are necessary to industrial growth.

> Unless measures are taken to improve the public services to accommodate the increase in concentration of population and to facilitate industrial and commercial growth, Edgefield County faces a period of unusually high unemployment rates or considerable out-migration.

Dan B. Mackey, Executive Director of the Upper-Savannah Planning and Development District, in Paragraph 5 of his Affidavit, dated August 31st, 1971, states that:

> From his careful study, the proposed project is critically needed, well-planned, ideally located and will provide an outstanding improvement for the underprivileged, unemployed and marginal economic groups of Edgefield County, and is essential to improving the economic conditions there.

As each of the Towns of Edgefield, Johnston and Trenton has a population of less than 10,000 inhabitants, each would come within the "smaller municipality" category of 42 U.S.C. § 1492 and would be entitled to priority under that section. Consequently, the court makes the following:

### FINDING OF FACT

The county-wide water system for Edgefield County, as it is presently proposed by the water authority, contemplates the receipt and use of an HUD loan to finance basic public works in smaller municipalities for which there is an urgent and vital public need consistent with the requirements of 42 U.S.C. § 1492.

### HUD GRANT

The HUD Grant of $690,000.00 is authorized by 42 U.S.C. § 3102 which provides as follows:

> The Secretary of Housing and Urban Development . . . is authorized to make grants to local public bodies and agencies to finance specific projects for basic public water fa-

cilities (including works for the storage, treatment, purification, and distribution of water) . . . .

The court finds as a fact that the plans for a county-wide water system for Edgefield County, as it is presently proposed by the water authority, contemplates the receipt and use of an HUD Grant to finance its specific project for basic public water facilities in compliance with the requirements of 42 U.S.C. § 3102.

## CONCLUSIONS OF LAW

■ Having thoroughly reviewed each of the arguments put forward by the plaintiff, it clearly appears that they have no merit. In order to be entitled to an injunction, the plaintiff has the burden of proving a clear case, reasonably free from doubt.

The extraordinary character of the injunctive remedy and the danger that its use in improper cases may result in serious loss or inconvenience to an innocent party require that the power to issue it should not be likely indulged in, but should be exercised sparingly and cautiously, after thoughtful deliberation, and with full conviction on the part of the court of its urgent necessity. In other words, the relief should be awarded only in clear cases, reasonably free from doubt, and when necessary to prevent great and irreparable injury. The complainant has the burden of proving the facts which entitle him to relief. 42 Am.Jur.2d, Injunctions, Section 26.

■ In addition, this court must consider the tremendously damaging effect that the granting of an injunction in this case would have upon the public interest:

The paramount interests of the public may have some bearing on the matter of granting injunctive relief to protect private rights. The fact that an important public interest would be prejudiced by an injunction may be a compelling reason for denying relief. The existence of such public interest will at least furnish a court of equity sufficient ground for exercising its discretion to refuse the remedy, and the court will generally stay its hand in the public interest where it reasonably appears that the private right will not suffer by the refusal of the injunctive order, where the damage to the complainant from denying the injunction will be slight, where the right invaded is merely a technical or unsubstantial one, or where the injury is one which can readily be compensated in damages, whereas the issuance of the order may or would occasion public inconvenience . . . 42 Am.Jur.2d, Injunctions, Section 59.

■ The matters complained of by the plaintiff relate to the exercise of judgment or discretion by executive departments of the federal government and by the duly appointed members of the Edgefield County Water and Sewer Authority. In such a case, the general rule is that injunctive relief should be denied and that the court should not attempt to substitute its judgment for that of the public official involved even if such judgment appears to be unwise, short of a showing of fraud, illegality or oppression.

. . . Equity will not attempt by injunction to substitute its own discretion for that of such officials in matters belonging to their proper jurisdiction. The courts cannot by injunctive process control or direct a head of an executive department in the discharge of any constitutional executive duty involving the exercise of judgment or discretion. The prevention of irreparable injury and of a multiplicity of suits cannot be invoked as grounds for equitable relief in such cases. Where a public officer essays to exercise the jurisdiction conferred upon him, his errors, although subject to subsequent correction, cannot be enjoined as an arbitrary exercise of his authority. Particularly will courts hesitate to interfere by injunction where the acts complained of are essential to the health and comfort of

the people at large. In fact, it may be stated as an established rule that injunction will issue against public officers only to prevent a breach of trust affecting public franchises, or some illegal act under color or claim of right injurious to the property or other rights of individuals or the public, or where serious injury will result to private individuals without corresponding public benefit.

A mandatory injunction may be an appropriate remedy to compel affirmative acts by public corporations and officers where the urgency for such relief is great and the legal remedy inadequate, or where the controversy is between a county and an officer whose duty it is to perform a ministerial act, but it will not issue to control the exercise of discretionary acts. 42 Am. Jur.2d, Injunctions, Section 175.

With regard to injunctive relief against the acts of public officials, boards, or agencies, a distinction is made between those acts which require the exercise of discretion or judgment and those which are purely ministerial. With respect to the former, there exists no power to control the executive discretion, however erroneous its exercise may seem to have been . . . 42 Am.Jur.2d, Injunctions, Section 176.

There is a class of cases which hold that if a public officer be required by law to do a particular thing, not involving the exercise of either judgment or discretion, he may be required to do that thing upon application of one having a distinct legal interest in the doing of the act. Such an act would be ministerial only. But if the matter in respect to which the action of the official is sought is one in which the exercise of either judgment or discretion is required, the courts will refuse to substitute their judgment or discretion for that of the official intrusted by law with its execu-

tion. Interference in such a case would be to interfere with the ordinary functions of government. State of Louisiana v. McAdoo, 234 U.S. 627, 34 S.Ct. 938, 58 L.Ed. 1506 (1914).

The general rule is that the courts will not interfere by injunction with the exercise of discretionary powers conferred by the state upon municipalities, and will not restrain the action of a municipal corporation acting through its duly appointed officers merely because such action may be unwise, extravagant, or a mistake of judgment. It is only where the action complained of is illegal, fraudulent, or clearly oppressive that equity will act to restrain it . . . . 42 Am.Jur. 2d, Injunctions, Section 180.

### LACHES

There was evidence that the plaintiff had been given a copy [8] of the Comprehensive Plan almost three (3) years before the institution of this action. The substance of the Water System now proposed by the Water Authority is set forth therein.

Appendix B of plaintiff's brief is an Affidavit by Ken Kilbourne which states that an advertisement of a public meeting pertaining to the Plans of the Water Authority was run in the *Edgefield Advertiser* on April 22 and April 29, 1970, giving notice of a meeting to be held at the Edgefield County Courthouse on April 30, 1970 at 4:30 P.M. The plaintiff is the Editor of the *Edgefield Advertiser*.

It is well established principle that 'equity aids the vigilant'; relief in that tribunal is confined to those who manifest reasonable diligence in asserting their rights and demanding equitable protection, and will be denied to those who sleep upon their rights to the prejudice of the party against whom relief is asked. The principle has peculiar force when the injunctive power of the court is invoked. Laches

---

8. Testimony of Representative Butler C. Derrick, Member of the South Carolina House of Representatives from Edgefield County.

or inexcusable delay will not be countenanced when this special form of relief is sought. Consequently, the remedy by way of injunction will not generally be granted in favor of one who, with full knowledge of what is being done or with means of acquiring such knowledge, is acquiescent, or delays in asserting, or neglects to assert, his rights until the defendant has placed himself in a position from which he is unable to extricate himself without great injury or damage . . . . 42 Am.Jur.2d, Injunctions, Section 61.

Based on the above, the court finds that the plaintiff is guilty of laches and unreasonable delay in waiting until August of 1971 to institute this action.

For this reason, in addition to the reasons heretofore stated, defendant should prevail.

There is ample evidence in the record of the damaging effect of the pendency of this action upon this project:

> "That if such project is delayed or blocked, such will tend to hazard the eventual availability of funds, since timing is very important relative to availability. No one can say with certainty the impact of considerable delay by reason of litigation, but such delay would present a real potential hazard to ultimate availability." Affidavit of Dan B. Mackey, paragraph 6.

The plaintiff appears to agree on this point, reference being made to the last paragraph of the plaintiff's brief.

A delay of a few months would certainly be costly to the project. A delay of even a few years in getting a water system planned for the rural areas, and an eventual delivery of water completed would be fatal to Edgefield County. The people will have all moved away; the County would have died.

## JUDGMENT

The request of plaintiff for a restraining order and/or injunction is not sup-ported on the face of the record and should be denied.

The Complaint is dismissed with costs.

The Clerk shall enter judgment accordingly.

And it is so ordered.